UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
(at London)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 6:23-CV-00058-CHB |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| DANNY T. BELL, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is before the Court on various motions by the parties. Defendant Danny T. Bell filed a Motion for Summary Judgment, [R. 85], to which the United States responded, [R. 109], and Bell replied, [R. 110]. Bell also filed a Motion in Limine to Exclude Plaintiff's Expert Witness, [R. 79], to which the United States responded, [R. 103]. Bell did not file a reply. Also before the Court is the United States' Motion for Rule 37(e) Remedies for Defendant's Spoliation, [R. 82], to which Bell responded, [R. 99], and the United States replied, [R. 106]. For the reasons set forth below, the Court will deny Bell's Motion for Summary Judgment, [R. 85], deny Bell's Motion in Limine, [R. 79], and grant the United States' Motion for Rule 37(e) Remedies, [R. 82].

## I.    BACKGROUND

Bell has owned and managed rental properties in Kentucky for more than twenty years. *See* [R. 109-1, p. 28]. These properties include two apartment complexes with a total of twenty-four units between the complexes. *Id.* at 25–30. Bell serves as the principal manager and landlord for these properties. *Id.* at 31–33. Through its investigation, the United States has identified and disclosed at least nine women ("aggrieved persons") who claim in some form or another that Bell sexually harassed them during various points between 2011 and 2023 while they were all his

1

tenants. [R. 109, p. 2]; *see also* [R. 87 (B.S.'s deposition transcript)]; [R. 88 (L.M.'s deposition transcript)]; [R. 89 (A.D.'s deposition transcript)]; [R. 90 (J.B.'s deposition transcript)]; [R. 91 (M.G.'s deposition transcript)]; [R. 92 (B.T.'s deposition transcript)]; [R. 93 (M.C.'s deposition transcript)]; [R. 94 (S.P.'s deposition transcript)]; [R. 95 (L.B.'s deposition transcript)].

On March 1, 2023, the United States informed Bell of its intention to file this lawsuit. [R. 82-4, p. 1]. On April 17, 2023, the United States filed this lawsuit alleging that Bell violated various provisions of the federal Fair Housing Act ("FHA") through his conduct in managing his rental properties. *See* [R. 1]. Specifically, the United States alleges that Bell engaged in a pattern and practice of sexual harassment of his female tenants that amounted to sex discrimination in violation of 42 U.S.C. § 3614(a), § 3604(b), and § 3617. On May 19, 2025, Bell filed his Motion in Limine to Exclude Plaintiff's Expert Witness, [R. 79], to which the United States responded, [R. 103], but Bell never replied. Also on May 19, 2025, the United States filed its Motion for Rule 37(e) Remedies for Defendant's Spoliation, [R. 82], to which Bell responded, [R. 99], and the United States replied, [R. 106]. On May 30, 2025, Bell filed a Motion for Summary Judgment, [R. 85], to which the United States responded, [R. 109], and Bell replied, [R. 110]. Accordingly, these motions are ripe for review. The Court rules on each in turn.

## II.   ANALYSIS

### A.   Defendant's Motion for Summary Judgment, [R. 85]

Bell filed a Motion for Summary Judgment arguing that "there is no genuine dispute as to any material fact and the moving party defendant Bell is entitled to judgment as a matter of law with respect to all claims asserted against him." [R. 85, p. 1]. The United States responded, [R. 109], and Bell replied, [R. 110]. For the reasons stated below, the Court will deny Bell's Motion for Summary Judgment.

## 1.      Legal Standard

Under Federal Rule of Civil Procedure 56, a court may grant summary judgment if it finds "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Winkler v. Madison Cnty.*, 893 F.3d 877, 890 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if the underlying substantive law identifies the fact as critical. *Anderson*, 477 U.S. at 248. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

The moving party bears the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 256. That burden may be satisfied by demonstrating that there is an absence of evidence to support an essential element of the non-moving party's case for which he or she bears the burden of proof. *Celotex Corp.*, 477 U.S. at 323.

Once the moving party satisfies this burden, the non-moving party must then produce "specific facts, supported by the evidence in the record, upon which a reasonable jury could find there to be a genuine fact issue for trial." *Bill Call Ford, Inc. v. Ford Motor Co.*, 48 F.3d 201, 205

3

(6th Cir. 1995) (citation omitted); *see Turner-Meadows v. GM, LLC*, 786 Fed. App'x 592, 595–96 (6th Cir. 2019). "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59 (1970)).  However, the Court is not obligated to "search the entire record to establish that it is bereft of a genuine issue of material fact." *In re Morris*, 260 F.3d 654, 665 (6th Cir. 2001). Rather, "the nonmoving party has an affirmative duty to direct the court's attention to those specific portions of the record upon which it seeks to rely to create a genuine issue of material fact." *Id.* The non-moving party's evidence must result in more than mere "metaphysical doubt as to the material facts," and "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position" will not suffice for the non-moving party to meet its burden. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citations omitted); *Anderson*, 477 U.S. at 252. Ultimately, there is no genuine issue of material fact and summary judgment is appropriate if the record, taken as a whole and viewed in the light most favorable to the non-moving party, could not lead the trier of fact to find for the non-moving party. *Matsushita Elec.*, 475 U.S. at 587 (citation omitted).

### 2.    Discussion

The FHA authorizes the Attorney General to sue "any person or group of persons" if she has reasonable cause to believe that (1) the defendant "is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights granted by" the FHA, or (2) "any group of persons has been denied any of the rights granted by this subchapter and such denial raises an issue of general public importance." 42 U.S.C. § 3614(a). "To demonstrate that a group of persons has been denied specific rights granted by the Act the government must show that the discriminatory conduct affects more than a single individual." *United States v. City of Parma, Ohio*, 494 F. Supp.

4

1049, 1095 (N.D. Ohio 1980), *aff'd*, 661 F.2d 562 (6th Cir. 1981). The United States notes in its response that, while its complaint originally "pled sex discrimination in violation of 42 U.S.C. § 3604 (a)–(c) and 42 U.S.C. § 3617," "[t]he United States proceeds now solely under 42 U.S.C. § [3604(b)] and 42 U.S.C. § 3617." [R. 109, p. 22 n.12]; *see also* [R. 1, pp. 3–4 (complaint)].

The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of . . . sex." 42 U.S.C. § 3604(b). "Section 3604(b) 'applies to post-access conduct,' extending to discriminatory behavior against renters once housing has been acquired and including the denial of continued rental of the property based on discrimination." *United States & Marr*, No. 1:14-CV-2880-JDB-EGB, 2016 WL 4126583, at \*8 (W.D. Tenn. Aug. 2, 2016) (quoting *Guevara v. UHM Props., Inc.*, No. 2:11-cv-2339-SHL-tmp, 2014 WL 5488918, at \*6 (W.D. Tenn. Oct. 29, 2014)); *see also id.* ("[I]t is difficult to imagine a privilege that flows more naturally from the purchase or rental of a dwelling than the privilege of residing therein." (quoting *United States v. Koch*, 352 F. Supp. 2d 970, 976 (D. Neb. 2004))).

Under § 3617, it is "unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed . . . any right granted or protected by sections 3603, 3604, 3605, or 3606 of [the FHA]." The Sixth Circuit has stated that "[t]his section reaches all practices which have the effect of interfering with the exercise of rights under the federal fair housing laws." *Campbell v. Robb*, 162 F. App'x 460, 473 (6th Cir. 2006) (citation omitted) (cleaned up).[1] "[T]he protections under sections 3604(b) and 3617 may

---

[1] *Campbell* states that the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies in the FHA context. However, Sixth Circuit Title VII case law makes clear that the *McDonnell Douglas* framework does not apply to claims for quid pro quo or hostile environment sexual harassment sex discrimination. *See Pollard v. E.I. DuPont de Nemours Co.*, 213 F.3d 933, 943 (6th Cir. 2000) ("When a plaintiff proves that a hostile work environment existed, there is no legitimate justification for such an environment, and thus recourse to the *McDonnell Douglas* test is not warranted. A defendant's only option is to deny the charges or argue that defendant effectively remedied the situation, not to submit that the hostile environment was in some way

be coextensive." *Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 861 (7th Cir. 2018) (citation omitted).

Courts recognize sexual harassment as a valid form of sex discrimination that violates § 3604(b) and § 3617. *See Marr*, 2016 WL 4126583, at *7–10; *Shellhammer v. Lewallen*, No. 84–357, 1985 WL 13505, at *1–2, 4 (6th Cir. 1985) (recognizing that sexual harassment is an actionable sex discrimination claim under the FHA); *DiCenso v. Cisneros*, 96 F.3d 1004, 1008–09 (7th Cir. 1996) (same); *Hall v. Meadowood Ltd. P'ship*, 7 F. App'x 687, 689 (9th Cir. 2001) (same); *Honce v. Vigil*, 1 F.3d 1085, 1088–89 (10th Cir. 1993) (recognizing that sexual harassment is a valid form of sex discrimination that violates § 3604(b)); *Fox v. Gaines*, 4 F.4th 1293, 1295 (11th Cir. 2021) (same).

Borrowing from the Title VII context for sex discrimination based upon sexual harassment, courts recognize two types of sex discrimination claims under the FHA: (1) quid pro quo sexual harassment claims, and (2) hostile housing environment claims. *Marr*, 2016 WL 4126583, at *7 (citing *Stevens v. Saint Elizabeth Med. Ctr., Inc.*, 533 Fed. App'x 624, 628 (6th Cir. 2013)); *see also Walker v. Crawford*, No. 5:97-CV-1033, 1999 WL 33917846, at *7 (N.D. Ohio Sept. 16, 1999) ("Sexual harassment, in turn, may be analyzed as falling into either the 'quid pro quo' or 'hostile environment' varieties."); *Fox*, 4 F.4th at 1297 ("[S]exual harassment—both hostile housing environment and quid pro quo sexual harassment—is actionable under the FHA, provided the plaintiff demonstrates that she would not have been harassed but for her sex."); *United States v. Hurt*, 676 F.3d 649, 654 (8th Cir. 2012) ("Sexual harassment is actionable under the FHA when

---

warranted."), *rev'd on other grounds*, 532 U.S. 843 (2001); *Huang v. Ohio State Univ.*, 116 F.4th 541, 560–62 (6th Cir. 2024) (applying the *McDonnell Douglas* test to other FHA claims but not the quid pro quo claim); *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 790–93 (6th Cir. 2000) (applying the *McDonnell Douglas* test to other FHA claims but not the hostile work environment claim); *Wanchik v. Great Lakes Health Plan, Inc.*, 6 F. App'x 252, 257–65 (6th Cir. 2001) (same); *Abeita v. TransAmerica Mailings, Inc.*, 159 F.3d 246, 250–54 (6th Cir. 1998) (same). Further, neither party suggest that it applies to these claims. *See generally* [R. 85]; [R. 109]; [R. 110].

it creates a hostile housing environment or constitutes quid pro quo sexual harassment." (internal quotation marks omitted)). The United States alleges both types of sexual harassment claims against Bell. *See* [R. 1, p. 2].

Bell argues in his motion that "there is no genuine dispute as to any material fact and the moving party defendant Bell is entitled to judgment as a matter of law with respect to all claims asserted against him." [R. 85, p. 1]. Bell contends that "there simply is no evidence whatsoever of actual quid pro quo sexual harassment in housing," *id.* at 16, and that "none of the allegations of the aggrieved persons rise to the level of the required severe or pervasive evidence of harassment necessary to establish a claim for hostile housing environment discrimination," *id.* at 4. Bell accordingly argues that "it will be impossible for the United States to present sufficient evidence at trial to warrant a verdict in its favor. *Id.* For the reasons stated below, the Court disagrees.

### a.       Quid Pro Quo Sexual Harassment

Bell argues that "there simply is no evidence whatsoever of actual quid pro quo sexual harassment." [R. 85, p. 16]. He further argues that the statements that Bell allegedly made were simply "vague" and "ambiguous," and therefore, are not a "sufficient bases [sic] upon which to find a verdict of sexual harassment in housing." *Id.* at 16–17. In response, the United States provides sixteen pages of factual allegations against Bell concerning various forms of sexual harassment. [R. 109, pp. 3–18].

In order to prevail on a claim of quid pro quo sexual harassment under the FHA, the plaintiff must establish (1) "unwelcome sexual harassment in the form of sexual advances or requests for sexual favors" and (2) that "submitting to these demands or advances was an *express or implied condition* for receiving [housing] benefits, or that refusing to submit resulted in a tangible [housing] detriment." *See Souther v. Posen Constr., Inc.*, 523 F. App'x 352, 354–55 (6th

Cir. 2013) (emphasis added) (requiring this standard for a quid pro quo sexual harassment claim under Title VII); *Huang*, 116 F.4th at 560 (stating in a Title VII quid pro quo sexual harassment sex discrimination claim that the plaintiff "must show that: (1) she was a member of a protected class; (2) [the defendant] subjected her to unwanted sexual advances; (3) these unwanted advances were because of her sex; (4) 'submission to the unwelcomed advances was an express or implied condition for receiving job benefits,' or that [the plaintiff's] refusal to submit to those advances caused [the defendant] to take adverse employment action against her" (quoting *Bowman v. Shawnee State Univ.*, 220 F.3d 456, 461, 461 n.5 (6th Cir. 2000))).[2] Quid pro quo sexual harassment can occur through either explicit or implicit sexual propositions. *See Souther*, 523 F. App'x at 354–55; *Quigley v. Winter*, 598 F.3d 938, 947 (8th Cir. 2010).

First, despite claiming that there is "no evidence" of *quid pro quo* sexual harassment, *id.* at 16, Bell notes in his motion that Aggrieved Person J.B. "claims that the day prior to the eviction hearing that Mr. Bell hugged her and tried to grope her and said 'we can make this all go away," *id.* at 7; *see also* [R. 90, p. 18 (J.B.'s deposition transcript)]. J.B. testified that she believed Bell's

---

[2] Some district courts within the Sixth Circuit appear to have applied a slightly higher standard in the FHA context that requires the defendant take an "adverse action" against the plaintiff to prevail on a quid pro quo sexual harassment housing discrimination claim. *See, e.g.*, *Robbins v. Am. Preferred Mgmt. Co.*, No. 5:05-CV-182, 2007 WL 2728746, at *9 (W.D. Mich. Sept. 17, 2007) ("[A] plaintiff may demonstrate that she was the victim of quid pro quo sexual harassment by showing that (1) she was subjected to unwelcome sexual conduct as described in the statute, and (2) the defendant used her submission to or rejection of the proscribed conduct as a factor in an adverse action."). However, that standard originates from Michigan state sexual harassment housing discrimination law. *See id.* (citing *Chambers v. Trettco*, 614 N.W.2d 910, 915 (Mich. 2000)). One court has applied that same standard solely to a quid pro quo sexual harassment claim under the FHA. *See Marr*, 2016 WL 4126583, at *7 (citing the standard from *Robbins* but also citing the standard from *Souther*). This standard appears to require an "adverse action" seemingly to the exclusion of a defendant offering housing benefits in exchange for sexual favors, which appears narrower than the corollary standard derived from the Sixth Circuit's Title VII precedent in *Souther*. The *Souther* standard is more aligned with the standard used in other circuits. *See Quigley*, 598 F.3d at 947 ("Quid pro quo harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." (citation and quotation marks omitted)); *Honce*, 1 F.3d at 1090 (citation omitted) (same); *Fox*, 4 F.4th at 1296 (citation omitted) (same). The Court believes that the standard set forth in *Souther* is the appropriate standard here. Regardless, even if an adverse action is required, there is sufficient evidence to raise a genuine issue of a material fact that J.B. and M.C. suffered adverse actions from Bell after denying his alleged sexual propositions. *See* [R. 90, p. 29 (J.B. testifying that she was evicted following her alleged quid pro quo encounter with Bell)]; [R. 93, p. 50, 81–83 (M.C. testifying that she was later evicted and became homeless for around ten months)].

comment was a request for sex made just prior to her eviction proceeding. [R. 90, p. 20]. J.B. testified that she was evicted following this encounter with Bell. *Id.* at 29. Bell also notes that M.C. "claims that Mr. Bell said to her that if she could not afford rent, then 'we can work something out while staring at my crotch.'" *Id.* at 10; *see also* [R. 93, p. 37 (M.C.'s deposition transcript)]. M.C. testified that "[a]ny time I was late for rent, or had to encounter him, he always stared at my crotch and told me we could work something out." [R. 93, p. 65]. M.C. told Bell that she "didn't like being talked to in that manner," *id.* at 58, and testified that she was later evicted and became homeless for around ten months. *Id.* at 50, 81–83.

In its response, the United States cites another incident of apparent quid pro quo sexual harassment by Bell involving B.S. [R. 109, p. 17]. B.S. testified that, based on what she had heard from other tenants, when Bell told her that "we'll work something out," she believed he was suggesting sexual favors in exchange for rental payment. *See* [R. 87, p. 44–46, 60–62 (B.S.'s deposition transcript)]. After this incident, B.S.'s housing situation deteriorated even further after Bell allegedly called B.S.'s teenage daughter and her friend "little hussies." *Id.* at 31. It got to the point where B.S. left the apartment before her lease was up because of both her and her daughter's discomfort living there. *Id.* at 43–44, 72.

This evidence related to J.B., M.C., and B.S. could lead a reasonable jury to find that Bell engaged in quid pro quo sexual harassment, especially when viewing these statements in the light most favorable to the United States. *See Anderson*, 477 U.S. at 255. In other words, the United States has provided sufficient evidence supporting its claim of sexual discrimination under the FHA based upon quid pro quo sexual harassment, and the question of whether Bell engaged in quid pro quo sexual harassment must be left for the jury.

**b.** **Hostile Housing Environment Sexual Harassment**

"Borrowing from employment law, a claim of hostile housing environment caused by sexual harassment is actionable where the defendant subjects an individual to unwelcome sexual harassment that is sufficiently severe or pervasive so as to interfere with or deprive the individual of her right to use or enjoy her home." *United States v. Webb*, No. 4:16-CV1400-SNLJ, 2017 WL 633846, at *2 (E.D. Mo. Feb. 16, 2017) (citing *Quigley*, 598 F.3d at 947). To prevail on a hostile housing environment claim on the basis of alleged sexual harassment, the plaintiff must show (1) harassment against a member of a protected class; (2) that the harassment was unwelcome harassment; (3) the harassment complained of was based upon sex; and (4) the harassment unreasonably interfered with housing or created a hostile or offensive housing environment that was severe or pervasive. *Walker v. Crawford*, 1999 WL 33917846, at *7–10 (citing *Honce*, 1 F.3d at 1090); *Robbins*, 2007 WL 2728746, at *9; *see also Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829–30 (6th Cir. 1999) (applying the same test in a Title VII hostile work environment claim).

"[I]solated and innocuous incidents do not support a finding of sexual harassment." *Robbins*, 2007 WL 2728746, at *10 (quoting *DiCenso*, 96 F.3d at 1008); *see also Walker v. Crawford*, 1999 WL 33917846, at *7–8 ("The harassment must be "sufficiently severe or pervasive" to alter the conditions of the housing arrangement. It is not sufficient if the harassment is isolated or trivial." (quoting *Honce*, 1 F.3d at 1090)). Although no one factor is dispositive, generally "the more severe harassment, the less need to show a repetitive series of incidents." *Brooks v. City of San Mateo*, 229 F.3d 917, 926 (9th Cir. 2000) (citation omitted). "Evidence of harassment of other female tenants is relevant to plaintiff's claim." *Walker v. Crawford*, 1999 WL 33917846, at *7–8 (quoting *Honce*, 1 F.3d at 1090). The Supreme Court has stated that, in evaluating a hostile work environment claim, a court must look to the totality of the circumstances

10

considering "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Applying this standard to a hostile housing claim based on sexual harassment, courts likewise consider the harassment's frequency, severity, threatening or humiliating nature, and whether it "unreasonably interferes with use and enjoyment of the premises." *See DiCenso*, 96 F.3d at 1008 (citations omitted); *Honce*, 1 F.3d at 1090 (citations omitted); *Jay v. Grand Mgmt. Servs., Inc.*, 783 F. Supp. 3d 1257, 1274 (D. Or. 2025) (citations omitted); *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1291 (E.D. Cal. 2013) (citations omitted).[3]

Bell does not challenge the first three factors of the United States' hostile housing claim, instead he argues that no reasonable juror could find that Bell's actions amounted to severe or pervasive sexual harassment. *See generally* [R. 85, pp. 17–25]. Specifically, Bell argues that

---

[3] Bell claims that in order to make a valid hostile housing environment sexual harassment claim, the United States must "prove that the discriminatory harassment resulted in constructive eviction." [R. 85, pp. 17–18 (quoting *Mohamed v. McLaurin*, 390 F. Supp. 3d 520, 548 (D. Vt. 2019))]. The cases Bell cites to support this proposition all show that this standard is coming from the Seventh Circuit case, *Bloch v. Frischholz*, 587 F.3d 771 (7th Cir. 2009). *See* [R. 85, pp. 17–18]. However, further examination of that case shows that this "constructive eviction" standard is not required for the claims at hand. First, much of the Seventh Circuit's reasoning was to explain what is required to "otherwise make unavailable or deny" for a claim under § 3604(a). *See Bloch*, 587 F.3d at 776–79 "(Availability of housing is at the heart of § 3604(a)."); *see also* § 3604(a) (making it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin"). As previously noted, the United States has abandoned its claim under § 3604(a). [R. 109, p. 22 n.12]. The Seventh Circuit does later note that "constructive eviction is an option under § 3604(b) as well" because "the right to inhabit the premises is a privilege of sale." *Bloch*, 587 F.3d at 779 (citation and quotation marks omitted). However, the court in *Bloch* by no means states that this standard is required for every type of § 3604(b) claim. *See id.* In fact, in the very next paragraph, the Seventh Circuit notes that "the 'privilege' to inhabit . . . is not the only aspect of § 3604(b)" that can be implicated. *Id.* What is important here is that—despite Bell's claim—*Bloch* did not concern a claim of severe or pervasive sexual harassment that violates § 3604(b) under a hostile housing environment claim. *See id.* 776–83. The claim that the United States alleges in this case is that Bell violated § 3604(b) through severe or pervasive sexual harassment, *see* [R. 109, pp. 23–24], a basis that has been consistently recognized by courts without reference to the constructive eviction standard, *see, e.g.*, *Walker v. Crawford*, 1999 WL 33917846, at *7–10; *West v. DJ Mortg., LLC*, 271 F. Supp. 3d 1336, 1351–52 (N.D. Ga. 2017); *Quigley*, 598 F.3d at 956–47; *Salisbury*, 974 F. Supp. 2d at 1290–91; *Jay*, 783 F. Supp. 3d at 1274; *Honce*, 1 F.3d at 1090; *DiCenso*, 96 F.3d at 1008–09; *Glagola v. MacFann*, 701 F. Supp. 3d 274, 280 (W.D. Pa. 2023). Accordingly, since the constructive eviction standard is not required for all types of § 3604(b) claims, and since the United States does not argue this as a basis for their § 3604(b) claim against Bell, the Court need not apply it to this case or motion.

"[n]one of the claimed aggrieved persons were subjected to sexual harassment which was severe or pervasive and accordingly, none of them endured a hostile housing environment." *Id.* at 25. Bell further argues that, as required by § 3614(a), "the government will not be able to demonstrate by a preponderance of the evidence at trial that *multiple persons* experienced sexual harassment at the hands of Danny Bell that was severe or pervasive so as to establish a claim for hostile housing environment sexual harassment." *Id.* at 23–24 (alteration in original). For the reasons stated below, the Court disagrees.

First, all of the previously-discussed evidence of quid pro quo sexual harassment would be relevant in considering whether Bell had a practice of engaging in severe and pervasive sexual harassment creating a hostile housing environment. Further, and as mentioned above, the United States fills sixteen pages of factual allegations against Bell concerning various forms of sexual harassment. [R. 109, pp. 3–18]. A non-exhaustive overview of this evidence from multiple tenants includes M.C.'s testimony of Bell brushing her leg, [R. 93, pp. 63–64 (M.C.'s deposition transcript)]; M.C.'s testimony that Bell would constantly stare at her crotch when speaking to her, *id.* at 58; M.C.'s testimony that Bell grabbed her hand and placed it on his shirtless chest while asking her to feel his pectoral muscle, *id.* at 62; B.T.'s testimony that Bell "cupped" her behind, [R. 92, pp. 21–23 (B.T.'s deposition transcript)]; L.B.'s testimony that Bell "rubbed his whole body against me . . . [a]nd his genitals literally rubbed me and it felt like it was erected [sic]," [R. 95, p. 28 (L.B.'s deposition transcript)]; L.B.'s testimony that Bell "caressed" her "whole forearm" while talking to her, *id.* at 30; L.M.'s testimony that Bell "purposely" smacked her breast multiple times while gesturing, [R. 88, p. 22 (L.M.'s deposition transcript)]; A.D.'s testimony that Bell told her that "your boobs are about to fall out of your shirt," [R. 89, p. 24 (A.D.'s deposition transcript)]; A.D.'s testimony that Bell entered her apartment unannounced while she was alone in the shower,

12

*id.* at 16; A.D.'s testimony that Bell would touch her unnecessarily, *id.* at 34; B.S.'s testimony that Bell would touch her every time the two of them met in person, [R. 87, p. 20 (B.S.'s deposition transcript)]; B.S.'s testimony that Bell told her that she had a "big ole booty and big ole boobies," *id.* at 66; B.S.'s testimony that Bell grabbed her buttocks and called them "chunky," *id.* at 35; and J.B.'s testimony that Bell tried to fondle her breast while giving her a hug with both arms, [R. 90, p. 18 (J.B.'s deposition transcript)].

Moreover, some of the most serious allegations against Bell concern his alleged conduct with S.P. [R. 85, pp. 10–12]; [R. 109, pp. 5–6]; *see also* [R. 94, pp. 24–32 (S.P.'s deposition transcript)]. Both parties agree that, after drinking a few beers, S.P. left with Bell in his truck, and then later woke up in Bell's bed with the belief that she and Bell had sexual relations. *See* [R. 85, pp. 10–12]; [R. 109, pp. 5–6]; [R. 110, pp. 4–6]. However, while Bell characterizes this as a "voluntary sexual encounter," [R. 110, p. 4], and provides some evidence to that effect, *see* [R. 94, pp. 68–69 (S.P. testifying that she later asked Bell "[w]hy didn't we ever get back together?" and that she told him that on the night of the sexual encounter that "I only had two or three beers" and "I wasn't that drunk")], the United States claims that Bell "raped" S.P. as she blacked out after consuming a beer that she left in Bell's truck and believes that she was not a "consensual participant" in their sexual encounter, [R. 109, pp. 5–6, 29 n.17]; [R. 94, p. 32]. In reply, Bell vehemently claims that the United States' characterization of these facts is "slanderous," "beyond the pale," and "disgusting Rule 11 libel." [R. 110, pp. 4–5]. While the Court understands that Bell contends that the encounter was consensual and provides some evidence supporting that claim, S.P. testified that it was not. [R. 94, p. 32 ("I don't believe that I was a consensual participant.")]. It is not for this Court to weigh the credibility of witnesses at this stage of the proceedings. *See Render v. FCA US, LLC*, 53 F.4th 905, 914 (6th Cir. 2022) (explaining that "[i]n reviewing a

summary judgment motion, credibility judgments and weighing of the evidence are prohibited" (quoting *Kirilenko-Ison v. Bd. of Edu. of Danville Indep. Schs.*, 974 F.3d 652, 660 (6th Cir. 2020))) (internal quotation marks omitted).

Worth emphasizing further, sexual harassment committed in the home is inherently more severe than the same sexual harassment committed elsewhere. *See Quigley*, 598 F.3d at 947 ("We emphasize that [the defendant] subjected Quigley to these unwanted interactions in her own home, a place where Quigley was entitled to feel safe and secure and need not flee, which makes [the defendant's] conduct even more egregious."); *Salisbury*, 974 F. Supp. 2d at 1292 ("The fact that the harassment took place in Ms. Salisbury's home is even more egregious when viewed in light of the fact that Ms. Salisbury lives alone and [the defendant] trespassed into her home uninvited and completely unexpectedly."); *Bartlett v. Hames*, No. 5:18-CV-1096-CLS, 2023 WL 4038657, at *15 (N.D. Ala. June 15, 2023) (explaining that this heightened severity consideration exists because of "a renter's dependence on a landlord for life's bare necessities—*e.g.*, heat, plumbing, shelter—preconditions for entering the workforce and earning a living, where Title VII governs relationships. That reality affords malfeasant landlords leverage over tenants far more sinister than that which often gives rise to Title VII disputes"); *Revock v. Cowpet Bay W. Condo. Ass'n*, 853 F.3d 96, 113 (3d Cir. 2017) ("Harassment that intrudes upon the 'well-being, tranquility, and privacy of the home' is considered particularly invasive." (quoting *Frisby v. Schultz*, 487 U.S. 474, 485 (1988))). One court has specifically noted that

> When sexual harassment occurs at work, at that moment or at the end of the work day, the woman may remove herself from the offensive environment. She will choose whether to resign from her position based on economic and personal considerations. In contrast, when the harassment occurs in a woman's home, it is a complete invasion in her life. Ideally, home is the haven from the troubles of the day. When home is not a safe place, a woman may feel distressed and, often, immobile.

14

*Beliveau v. Caras*, 873 F. Supp. 1393, 1397 n.1 (C.D. Cal. 1995) (citation and quotation marks omitted).

Bell allegedly harassed nearly all of the aggrieved persons in their homes and while serving as their landlord. *See* [R. 93 (M.C.'s deposition transcript)]; [R. 92 (B.T.'s deposition transcript)]; [R. 95 (L.B.'s deposition transcript)]; [R. 88 (L.M.'s deposition transcript)]; [R. 89 (A.D.'s deposition transcript)]; [R. 87 (B.S.'s deposition transcript)]; [R. 90 (J.B.'s deposition transcript)]. Furthermore, many of the aggrieved persons testified that Bell's conduct made them feel uncomfortable in their homes or otherwise contributed to their decision to vacate, thus demonstrating an interference with their enjoyment of the rented premises. *See* [R. 94, p. 36 (S.P. testifying that she moved out because "I was sick of trying to dodge" and that "I had to change how I normally did things. If I wanted to go outside, I had to look outside and see if [Bell] was out there. If he was out there, I wouldn't go outside. I just felt very uncomfortable")]; [R. 92, p. 16 (B.T. testifying that she moved out because "I didn't really feel comfortable staying in the apartment by myself and [Bell] being my landlord")]; [R. 88, p. 27 (L.M. testifying that Bell's actions made her "feel uncomfortable in [her] home")]; [R. 91, p. 21 (M.G. testifying that she moved out because "I was feeling uncomfortable at the apartment")]; [R. 89, p. 31 (A.D. testifying that Bell's actions made her feel afraid, made her not want to be at home by herself, and was the reason "why my mom would pick me up every day and take me to her house")]; [R. 87, pp. 43–44 (B.S. testifying that she moved out in part because "I was pretty uncomfortable with the whole situation" and "my girls were not comfortable staying there")].

Further, multiple of the aggrieved persons testified that Bell frequently engaged in the alleged sexual harassing conduct. *See* [R. 93, p. 65 (M.C. testifying that "every time" she interacted with Bell he would stare at her crotch)]; [R. 87, p. 20 (B.S. testifying that "I was never in Mr.

15

Bell's presence that he didn't touch me in some way")]; *id.* at 32 (B.S. testifying about Bell's "habit" of looking her up and down); *id.* at 67 (B.S. testifying that Bell made comments about her body about "three-quarters" of the time that she saw him); [R. 92, p. 21 (B.T. testifying that there were "many times" Bell made inappropriate comments that made her feel "very uncomfortable to be around him")]; [R. 88, pp. 24–25 (L.M. testifying that there were "more incidents" but the one that she was describing was one where she could remember everything that happened)]; *id.* at 30 (L.M. testifying that there were "other comments" in addition to the ones she specifically described, but that she could not remember everything); *id.* at 25 (L.M. testifying that there were "multiple occasions" Bell made comments about her daughter's appearance in a manner that made her uncomfortable); [R. 89, p. 29 (A.D. testifying that Bell made comments about her appearance two to three days a week)].

Various courts have denied a defendant's motion for summary judgment on similar facts under the FHA. *See West*, 271 F. Supp. 3d at 1352–55 (denying summary judgment on a hostile housing environment claim because the defendant's sexually inappropriate text exchange, sexual assault incident, and phone conversations discussing nude photos in exchange for repairs was sufficient evidence that a jury could find severe or pervasive sexual harassment); *Salisbury*, 974 F. Supp. 2d at 1292 (denying summary judgment on a hostile housing environment claim where the defendant on multiple occasions told the plaintiff he had "urges" for her while cornering her inside of or next to her home); *Williams v. Poretsky Mgmt., Inc.*, 955 F. Supp. 490, 497 (D. Md. 1996) (denying summary judgment on a hostile housing environment claim because the plaintiff moved out to avoid further harassment and suffered post-traumatic stress disorder as a result of the harassment); *Glover v. Jones*, 522 F. Supp. 2d 496, 504 (W.D.N.Y. 2007) (denying summary judgment on a hostile housing environment claim because the defendant "verbalized, repeatedly,

16

his desire to have sex with [the plaintiff], kissed her on the mouth and put his tongue in her mouth, hugged her, put his arm around her, and touched her breast"); *Bartlett v. Hames*, No. 5:18-CV-1096-CLS, 2023 WL 4038657, at *13 (N.D. Ala. June 15, 2023) (denying summary judgment on a quid pro quo claim because the defendant suggested that he could pay the plaintiff's rent in exchange for sexual favors); *id.* at 14 (denying summary judgment on a separate quid pro quo claim because, while asking the plaintiff to perform oral sex acts, he said that he would "work with" her on rental payments); *id.* at 17–18 (denying summary judgment on a hostile housing environment claim because the defendant entered the plaintiff's home unannounced while the plaintiff was showering and then implicitly propositioned her for sex in exchange for completing repairs); *id.* at 18 (denying summary judgment on a separate hostile housing environment claim because the defendant entered the plaintiff's home unannounced and propositioned her for sex); *Brillhart v. Sharp*, No. 4:CV-07-1121, 2008 WL 2857713, at *10 (M.D. Pa. July 21, 2008) (denying summary judgment on a hostile housing environment claim because the defendant repeatedly grabbed the plaintiff's breasts, once attempted to pry her legs apart, demanded sex, and the plaintiff presented evidence of similar sexual harassment allegations from six different women); *Marr*, 2016 WL 4126583, at *8–10 (denying a defendant's motion for summary judgment on claims of quid pro quo and hostile-housing sex discrimination under § 3604(b) and § 3617 in part because the defendant "sent a number of unwelcome, sexually explicit text messages to Marr, began surveilling her from his house and harassing her for sexual favors, and evicting her upon her refusal to pose nude for him"); *Monus v. Riecke*, No. CV 21-218, 2021 WL 1721010, at *3 (E.D. La. Apr. 30, 2021) (denying a defendant's motion to dismiss and noting "that deliberate and unwanted touching of intimate body parts, even a single incident, can constitute severe sexual harassment" sufficient to establish a hostile housing claim under the FHA); *but see Walker v.*

17

*Crawford*, 1999 WL 33917846, at *8 (granting a defendant's motion for summary judgment on a quid pro quo claim noting that the conduct was "isolated" and the plaintiff "did not think much of it"); *Robbins*, 2007 WL 2728746, at *10 (granting summary judgment for the defendants on these same claims where "Plaintiffs identify no instance of communication containing any sexual content. Nor did Knauss or any other Defendant make any sexual approach or contact").

Taken together, the government has pointed to "specific facts, supported by the evidence in the record" on which a reasonable jury could find that Bell engaged in sex discrimination under the FHA based on quid pro quo and hostile housing environment discrimination. *See Bill Call Ford*, 48 F.3d at 205. While Bell urges that the allegations against him are false and that he never made these statements, [R. 85, p. 2]; [R. 110, p. 1], based on the conflicting record evidence, summary judgment would be inappropriate. *See Riley v. Coutu*, 172 F.R.D. 224, 227 (E.D. Mich. 1997) ("Merely because defendant has denied any such statements or actions does not require summary judgment in his favor. To the contrary, such a dispute of fact requires adjudication by trial."); *Bateman v. Therapeutic Innovations, Inc.*, No. CIV.A. 7:05-CV-40060, 2007 WL 460828, at *2 (W.D. Va. Feb. 8, 2007) (noting in a Title VII case that "[t]he court denied summary judgment in this case largely because of the Plaintiff's allegation of rape"); *Kremer v. Harris Tr. & Sav. Bank*, No. 91 C 6382, 1993 WL 496694, at *1 (N.D. Ill. Nov. 29, 1993) ("The parties dispute whether Spain made the statements, so Spain is not entitled to summary judgment based on his denial.").

As a final matter, Bell seemingly argues that the United States lacks evidence that Bell's discrimination was against a "group of persons." [R. 85, pp. 23–25]. However, as detailed above, the United States has presented sufficient evidence at this stage of Bell's alleged sexual harassment of at least eight different aggrieved persons. [R. 93 (M.C.'s deposition transcript]; [R. 92 (B.T.'s

18

deposition transcript)]; [R. 95 (L.B.'s deposition transcript)]; [R. 88 (L.M.'s deposition transcript)]; [R. 89 (A.D.'s deposition transcript)]; [R. 87 (B.S.'s deposition transcript)]; [R. 90 (J.B.'s deposition transcript)]; [R. 94 (S.P.'s deposition transcript)]. Insofar as this is a separate basis to argue that summary judgment is proper, the Court rejects that argument. *See City of Parma*, 494 F. Supp. at 1095 ("To demonstrate that a group of persons has been denied specific rights granted by the Act the government must show that the discriminatory conduct affects more than a single individual.").

On this record, a reasonable jury could find that Bell had a pattern and practice of discriminating against his tenants on account of their sex in violation of the FHA. Accordingly, and for the reasons detailed above, the Court will deny Bell's Motion for Summary Judgement.

### B.      Defendant's Motion in Limine, [R. 79]

Bell filed a Motion in Limine to Exclude Plaintiff's Expert Witness under Federal Rule of Evidence 702 concerning the proffered testimony of Robert Fanelli. [R. 79]. As the United States succinctly describes it, Robert Fanelli will "give expert testimony regarding victim responses to sexual assault and other forms of sexual misconduct, the nature of sexual assault, the behavior of sexual assault perpetrators, and the components of alcohol- or drug-facilitated sexual assault, and intends to offer relevant and reliable opinions." [R. 103, p. 2]; *see also* [R. 80, pp. 6–11 (Fanelli's report)]. Bell argues that Fanelli

> is not qualified to testify as an expert in this case and even if he were, his proffered testimony will not help or assist the trier of fact to understand the evidence or to determine a fact in issue, his testimony is not based upon sufficient facts or data, his testimony is not the product of reliable principles and methods, and his proffered opinions do not reflect a reliable application of the principles and methods to the facts of the case.

[R. 79, p. 1]. The United States responded to Bell's Motion in Limine. [R. 103]. Bell did not file a reply. For the reasons stated below, the Court will deny Bell's Motion in Limine.

### 1.    Legal Standard

Federal Rule of Evidence 702, which governs the use of expert testimony, guides the

Court's analysis. Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education, may testify in the form of an opinion or otherwise if:
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Sixth Circuit has found that, based on the language of Rule 702, an expert's opinion

is admissible if it satisfies three requirements:

> First, the witness must be qualified by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. Second, the testimony must be relevant, meaning that it "will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, the testimony must be reliable. *Id.*

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

Ultimately, the trial judge is the gatekeeper, ensuring that expert testimony satisfies the

requirements of reliability and relevance. *See Daubert*, 509 U.S. at 597 (recognizing "a

gatekeeping role for the judge" under Rule 702). However, the proponent of the testimony bears

the burden of establishing its admissibility by a preponderance of proof. *Nelson v. Tenn. Gas

Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001) (citing *Daubert*, 509 U.S. at 592 n.10).

Nevertheless, "[a]ny doubts regarding the admissibility of an expert's testimony should be

resolved in favor of admissibility." *In re: E. I. du Pont de Nemours & Co. C-8 Pers. Injury Litig.*,

337 F. Supp. 3d 728, 739 (S.D. Ohio 2015) (citations omitted). Therefore, "rejection of expert

testimony is the exception, rather than the rule, and [courts] will generally permit testimony based

on allegedly erroneous facts when there is some support for those facts in the record." *In re Scrap Metal*, 527 F.3d at 530 (citation modified). With this standard in mind, the Court turns to the pending Motion in Limine. [R. 79].

### 2.    Discussion

#### a.    Qualification

Regarding the first of the requirements under Rule 702, the Sixth Circuit has explained that "[e]xperts are permitted a wide latitude in their opinions, including those not based on firsthand knowledge, so long as 'the expert's opinion [has] a reliable basis in the knowledge and experience of the discipline.'" *Jahn v. Equine Servs., PSC*, 233 F.3d 382, 388 (6th Cir. 2000) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)). Accordingly, the Court's role is to examine "not the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994). Ultimately, "a witness is not a qualified expert simply because he self-identifies as such," but courts "take a liberal view of what 'knowledge, skill, experience, training, or education' is sufficient to satisfy the requirement." *Bradley v. Ameristep, Inc.*, 800 F.3d 205, 208–09 (6th Cir. 2015) (quoting *Pride v. BIC Corp.*, 218 F.3d 566, 577 (6th Cir. 2000)).

Bell makes various arguments as to why Fanelli is not qualified to testify as an expert under Rule 702. First, Bell argues that he is not qualified because Fanelli has no past experience dealing with civil sexual harassment cases. [R. 79, pp. 5–7]. Specifically, Bell states that

> Mr. Fanelli appears to have a great deal of training and experience in the area of criminal sexual assault. The problem for the United States is that this case is not a sexual assault case. Mr. Bell is not and has not ever been charged with sexual assault or rape. No such charges are pending and there is no allegation in the Complaint of sexual assault or otherwise. Instead, the only allegation against Mr. Bell in this case is that he sexually harassed certain of his former tenants. Mr. Fanelli admittedly has no idea as to the elements of an actionable sexual harassment in housing claim.

21

*Id.* at 5.

In response, the United States argues that "Mr. Fanelli has sufficient professional experience to render him qualified to provide his proffered expert testimony." [R. 103, p. 2]. The United States then details Fanelli's experiences and qualifications relevant to his proffered testimony. *Id.* Of note, Fanelli worked as a police officer for twenty-two years supervising and investigating hundreds of sexual assault cases. *See* [R. 80, p. 3]; *id.* at 15–17 (Fanelli's CV). Through his work over the past five years as a consultant with the International Association of Chiefs of Police ("IACP"), Fanelli created curricula and trained law enforcement officers on trauma-informed investigations, sexual assault, gender-based violence, and alcohol- and drug-facilitated sexual assault. *Id.* at 3–4, 15. Fanelli has also been involved with multiple reviews of different law enforcement agencies' sexual-assault investigation policies, practices, and procedures. [R. 81, pp. 9–10]; [R. 80, pp. 15–17]. Based upon this experience, the United States argues that Fanelli

> is qualified to opine on victim responses to sexual assault and other forms of sexual misconduct, the nature of sexual assault, the behavior of sexual assault perpetrators, and the components of alcohol- or drug-facilitated sexual assault—the topics covered in his expert report and the topics on which he intends to testify at trial.

[R. 103, p. 2]; *see also* [R. 80 (Fanelli's report)]; *id.* at 15–17 (Fanelli's CV).

In challenging Fanelli's qualifications to testify as an expert in this case, Bell does not dispute any of the factual claims of Fanelli's background or experience. *See* [R. 79, pp. 5–7]. Instead, Bell's primary challenge is that, while Fanelli might be an expert in criminal sexual assault or rape, "Fanelli knowns absolutely nothing about sexual harassment cases." *See id.* at 5, 7. At times in his motion, Bell makes this claim to argue that Fanelli is not qualified to be an expert. *See id.* at 5. At other points he uses this claim to argue that Fanelli's proffered testimony would have

22

no relevance to the asserted claim. *See id.* at 6. Since the parties do not dispute the specifics of Fanelli's background and experience, the Court believes that Bell's argument concerning the distinction between sexual assault and sexual harassment is more aptly considered in discussing the relevance of Fanelli's proffered testimony. Accordingly, the Court more thoroughly addresses this argument in that following subsection. *See infra* Section II.B.2. Addressing this argument briefly here, this case is about sex discrimination based upon Bell's alleged pattern and practice of sexually harassing his tenants. *See* [R. 1]. Bell does not dispute that Fanelli is well qualified to provide expert testimony of victims' post-incident behavior following sexual assault or battery, at least in the criminal context. *See* [R. 79, pp. 5–7]. The Court likewise finds that Fanelli is qualified to provide expert opinion as to the aggrieved persons' post-incident behavior for similar, even if not to the same degree, unwanted sexual attention or touching. *See also* [R. 81, pp. 50–51 (Fanelli testifying that he has experience evaluating victims of simple sexual battery, inappropriate sexual contact, and sexual misconduct)]; *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1302 (11th Cir. 2001) (in a civil sexual harassment case, upholding the admissibility of expert testimony about "common responses by victims of rape or harassment, such as the failure to resist a perpetrator . . . and the failure to file or a delay in filing a formal report or charge").

Before turning to relevance, the Court will address Bell's various other challenges to Fanelli's qualification. First, Bell states that "this is the first occasion [Fanelli] has ever been retained as a potential expert witness in a sexual harassment case." [R. 4, p. 79]. Insofar as Bell is arguing that Fanelli is not qualified as an expert simply because he has never served as an expert in this type of case before, that argument is without merit. *See McDonald v. City of Memphis*, No. 2:12-CV-2511-SHL-DKV, 2016 WL 8201168, at *8 (W.D. Tenn. Aug. 26, 2016) ("Federal Rule of Evidence 702 requires that an expert's qualification rest on his 'knowledge, skill, experience,

23

training, or education,' not on his previous opportunities to testify. It would be paradoxical to require an expert to have previously testified as an expert in order to become qualified as an expert."); *United States v. Lee*, 339 F. App'x 153, 159 (3d Cir. 2009) (noting that that fact that "this was Agent Parks's first time testifying as an expert does not undermine those qualifications").

Second, Bell argues that Fanelli is not qualified to serve as an expert in this case because of his lack of experience or knowledge with the FHA or its associated claims. *See* [R. 79, p. 4 ("Finelli [sic] admits that he has never read or reviewed the [f]ederal Fair Housing Act, which is at issue in this case.")]; *id.* at 5 ("Fanelli admittedly has no idea as to the elements of an actionable sexual harassment in housing claim."). This argument is likewise without merit. As the United States correctly points out, "Fanelli is not being proffered as an expert in the Fair Housing Act, or even in sexual harassment in housing specifically." [R. 103, p. 7]. Instead Fanelli "is being offered as an expert in sexual assault and other forms of sexual misconduct." *Id.* The Sixth Circuit has explicitly stated that "[t]he fact that a proffered expert may be unfamiliar with pertinent statutory definitions or standards is not grounds for disqualification. Such lack of familiarity affects the witness' [sic] credibility, not his qualifications to testify." *Davis v. Combustion Eng'g, Inc.*, 742 F.2d 916, 919 (6th Cir. 1984) (citing *Ellis v. K-Lan Co.*, 695 F.2d 157, 161 (5th Cir. 1983)); *see also Dilts v. United Grp. Servs., LLC*, 500 F. App'x 440, 444 (6th Cir. 2012) ("That [the expert] may have lacked familiarity with some aspects of industrial accidents does not constitute sufficient grounds for disqualification." (citing *Davis*, 742 F.2d at 919)); *United States v. Hofstetter*, No. 3:15-CR-27-TAV-DCP, 2019 WL 6750362, at *3 (E.D. Tenn. Dec. 11, 2019) (citing this standard from *Davis* and noting that the "defendants thoroughly attacked the witness's credibility on cross examination and re-cross, and the Court will instruct the jury that they are to determine the weight and credibility to be given to an expert witness's testimony"). Accordingly, the Court will reject

24

this argument because, simply put, Fanelli's lack of experience or knowledge of the FHA does not make him unqualified to serve as an expert for his proffered testimony. Instead, Bell's counsel may cross-examine Fanelli at trial and challenge Fanelli's familiarity with the FHA and his credibility as an expert. *See Davis*, 742 F.2d at 919. And the Court can likewise instruct the jury to determine the weight and credibility to be given the expert's testimony. *See id.*

Third, Bell argues that "Fanelli's opinions are little more than direct legal conclusions." [R. 79, p. 8]. The proffered testimony in question is Fanelli's conclusion that the behavior of the aggrieved persons is "not inconsistent with behavior seen in victims of sexual assault and harassment." *See id.*; [R. 80, p. 2]. This argument is likewise without merit.

The Sixth Circuit has held that expert opinion is excluded "*only* when the witness explicitly testifies, in 'specialized' legal terminology, that a defendant violated (or did not violate) the law." *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 317 (6th Cir. 2019) (alteration in original) (citations omitted). In *Babb*, the Sixth Circuit noted the "'subtle,' but 'nonetheless important' distinction between 'opin[ing] on the ultimate question of liability' (impermissible), and 'stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue' (permissible)." *Id.* (quoting *Berry*, 25 F.3d at 1353); *see also Killion v. KeHE Distrib., LLC*, 761 F.3d 574, 593 (6th Cir. 2014) (affirming the district court's exclusion of an expert report that "plainly attempt[ed] to define legal terms"); *Berry*, 25 F.3d at 1353–54 (holding that an expert stated an improper legal conclusion by testifying that a police department's "failure to direct and discipline and train their officers not to use improper deadly force constitut[ed] a pattern of gross negligence [and/or] deliberate indifference"); *Torres v. Cnty. of Oakland*, 758 F.2d 147, 149–151 (6th Cir. 1985) (holding that an expert stated an improper legal conclusion by answering in the affirmative to the question "it is

25

true, [doctor], that you did not believe that [plaintiff] had been discriminated against because of her national origin in that interview process?"). While the expert cannot opine as to "the ultimate question of liability," he can state "opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue." *Berry*, 25 F.3d at 1353. The Court is mindful of this "subtle" line and will ensure it is not crossed.

In arguing that Fanelli is not qualified because he has no knowledge or experience with the FHA, *see, e.g.*, [R. 79, p. 4–5], Bell undercuts his claim that Fanelli will be testifying as to the "specialized legal terminology" of the FHA or Bell's liability under the asserted claims. *See Babb*, 942 F.3d at 317. Instead, as the United States correctly points out, [R. 103, p. 15], Fanelli's proffered testimony will provide information from which a jury may conclude that Bell has violated the law, but it does not embrace that ultimate issue itself. As the Sixth Circuit and many other courts have done in the criminal context, the Court will likewise permit this form of expert opinion testimony. *See, e.g.*, *United States v. Smith*, No. 96-5385, 1998 WL 136564, at *2 (6th Cir. Mar. 19, 1998) (upholding the admissibility of expert testimony that victims of rape or sexual assault often delay or do not report their rapes or assaults); *United States v. LaVictor*, 848 F.3d 428, 443 (6th Cir. 2017) ("Although this Circuit's pronouncements on the issue have been more muted, we did recognize in an unpublished decision that an expert witness's testimony on why victims do not report incidents of domestic abuse was relevant." (citing *United States v. Smith*, 1998 WL 136564)); *Sanford v. Russell*, 387 F. Supp. 3d 774, 788 (E.D. Mich. 2019) (noting that the *LaVictor* found such expert testimony to "be helpful to the jury, particularly to rebut common misconceptions about rape victims, such as by explaining that an inability to recall specific details is typical for victims of physical trauma, and to rebut a defendant's assertion that a victim was unreliable because the rape was not immediately reported"); *United States v. Simmons*, 470 F.3d

26

1115, 1123 (5th Cir. 2006) (upholding the admissibility of expert testimony regarding whether a witness' behavior following an alleged rape was consistent with that of rape victims generally); *see also Griffin*, 261 F.3d at 1302 (in a civil sexual harassment case, upholding the admissibility of expert testimony about "common responses by victims of rape or harassment, such as the failure to resist a perpetrator . . . and the failure to file or a delay in filing a formal report or charge").

The Court is unpersuaded by any of Bell's arguments that Fanelli is not qualified to testify as an expert in this case. Based on Fanelli's undisputed background and experience as detailed above, the Court finds that this first requirement is met. *See In re Scrap Metal*, 527 F.3d at 528–29.

### b.    Relevance

Under Rule 702's requirement for the expert testimony to be relevant, "[e]xpert testimony is relevant . . . if it will assist the trier of fact to better understand the evidence or to decide a material fact in issue." *United States v. Gallion*, 257 F.R.D. 141, 150 (E.D. Ky. 2009); *see also In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) ("[T]he testimony must be relevant, meaning that it 'will assist the trier of fact to understand the evidence or to determine a fact in issue.'" (quoting Fed. R. Evid. 702)). The Sixth Circuit has noted that "[h]elpful opinions do not merely tell the jury what result to reach" nor do they assist the trier of fact by "address[ing] matters that [are] equally within the competence of the jurors to understand and decide." *Youngberg v. McKeough*, 534 F. App'x 471, 479 (6th Cir. 2013) (alteration in original) (quoting *McGowan v. Cooper Indus., Inc.*, 863 F.2d 1266, 1272 (6th Cir.1988)). The Sixth Circuit has further noted that "[i]n cases involving law-enforcement experts, . . . the district court, in performing its gatekeeping role, must assess whether, without expert testimony, the average juror

27

is unlikely to understand the material about which the expert proposes to testify." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (citation and quotation marks omitted).

As mentioned above, Bell's principal challenge to the relevance of Fanelli's proffered testimony rests on the argument that his expertise and report relate to criminal sexual assault and not civil sexual harassment. Bell states in his motion that "Fanelli's report uses the term '*assault*' on one hundred and two (102) occasions. Mr. Fanelli's report uses the term '*victim*' on ninety-three (93) occasions. His report rarely speaks of sexual harassment. This case is about claims of sexual harassment. It is not a sexual assault case." [R. 97, pp. 3–4]. Bell further argues that Fanelli's "proposed testimony has no relevance to the claims that are at issue in this case. . . . This is a case involving claims of sexual harassment, not sexual assault." *Id.* at 6. As the United States correctly points out in its response, "Defendant appears to view the two concepts—sexual harassment and sexual assault—as totally distinct and unrelated." [R. 103, p. 3]. For the purpose of analyzing the relevance of Fanelli's proffered testimony under Rule 702, the Court does not believe that these concepts are as distinct as Bell suggests.

First, courts within and outside of the Sixth Circuit have understood sexual assault to be a form of sexual harassment. *Kollaritsch v. Michigan State Univ. Bd. of Trs.*, 944 F.3d 613, 620 (6th Cir. 2019) (stating that "we do not doubt that a sexual assault would be such a severe incident" of sexual harassment in a Title IX sexual harassment case); *Dunbar v. Cleveland Inst. of the Arts*, No. 1:23-CV-01587, 2025 WL 2780384, at *4 (N.D. Ohio Sept. 30, 2025) (noting in a Title IX sexual harassment case that there is a "clear understanding that sexual assaults can qualify as sexual harassment. And sexual assault is—perhaps—the most severe form of harassment." (citation omitted)); *Rene v. MGM Grand Hotel, Inc.*, 305 F.3d 1061, 1065 (9th Cir. 2002) (stating that "[p]hysical sexual assault has routinely been prohibited as sexual harassment under Title VII"

28

and collecting cases); *Beliveau*, 873 F. Supp. at 1398 (noting that any valid claim of sexual battery "would support a sexual harassment claim under the federal Fair Housing Act").

Bell's indication that these two concepts are completely distinct is not supported by the law. Courts consistently treat sexual assault as a form of sexual harassment. It may be true that not all forms of sexual harassment are similarly sexual assault, but instead that sexual assault is a severe subset of sexual harassment. *See Dunbar*, 2025 WL 2780384, at *4 ("And sexual assault is—perhaps—the most severe form of harassment."). Nonetheless, the facts of this case show that many of the allegations against Bell could be validly classified as allegations of sexual assault or battery. *See* sources cited *supra* Section II.A.2; *see also* [R. 81, p. 50 (Fanelli testifying that states have varying levels of what constitute sexual battery, with some simply requiring "unwanted touch")]; K.R.S. 510.110, 510.120, 510.130 (criminal sexual abuse in the first, second, and third degrees). This is especially true regarding S.P.'s allegations against Bell. *See* [R. 94, p. 32 ("I don't believe that I was a consensual participant.")]. Regardless, whether it be sexual assault, sexual battery, or sexual harassment, how a person responds to these similar types of encounters are clearly comparable and relevant to this case. *See United States v. Smith*, 1998 WL 136564, at *2 (upholding the admissibility of expert testimony that victims of rape or sexual assault often delay or do not report their rapes or assaults); *LaVictor*, 848 F.3d at 443 ("Although this Circuit's pronouncements on the issue have been more muted, we did recognize in an unpublished decision that an expert witness's testimony on why victims do not report incidents of domestic abuse was relevant." (citing *United States v. Smith*, 1998 WL 136564)); *Sanford*, 387 F. Supp. 3d at 788 (noting that the *LaVictor* found such expert testimony to "be helpful to the jury, particularly to rebut common misconceptions about rape victims, such as by explaining that an inability to recall specific details is typical for victims of physical trauma, and to rebut a defendant's assertion that

a victim was unreliable because the rape was not immediately reported"); *United States v. Johnson*, 860 F.3d 1133, 1140 (8th Cir. 2017) ("[E]xpert testimony about how individuals generally react to sexual abuse—such as not reporting the abuse and not attempting to escape from the abuser— helps jurors evaluate the alleged victim's behavior."); *Snider v. Consolidation Coal Co.*, 973 F.2d 555, 558–60 (7th Cir. 1992) (considering the admissible evidence of "expert testimony about the tendencies of victims of sexual harassment" in a Title VII hearing).

Bell cites to various cases that he claims support the conclusion that Fanelli's expert testimony should be excluded. *See* [R. 79, pp. 8–11]. However, these cases are readily distinguishable and inapposite to the case at hand. *Cf. Lipsett v. Univ. of Puerto Rico*, 740 F. Supp. 921, 925 (D.P.R. 1990) (excluding expert testimony as to "whether or not there has been sexual harassment and a hostile work environment in violation of the law which would make the defendants liable"); *Smith v. Colorado Interstate Gas Co.*, 794 F. Supp. 1035, 1044 (D. Colo. 1992) (excluding expert testimony that "race and gender were important influencing factors in defendant's mistreatment of [the plaintiff]"); *Ward v. Westland Plastics, Inc.*, 651 F.2d 1266, 1270 (9th Cir. 1980) (affirming the district court's exclusion of expert opinion testimony that the defendant "discriminated against [Plaintiff] on account of her sex"); *Wilson v. Muckala*, 303 F.3d 1207, 1218–19 (10th Cir. 2002) (affirming the district court's exclusion of expert testimony on the defendant's sexual harassment policies and the reasonableness of its response to the plaintiff's report of harassment); *Daniels v. Grand Lux Cafe, LLC*, No. CIV.A.12-7848 JEI, 2015 WL 1398325, at *3–5 (D.N.J. Mar. 26, 2015) (excluding expert testimony on the adequacy of the defendant's sexual harassment policies). None of these cases involved expert testimony similar to Fanelli's, that is, testimony regarding how a victim may respond to sexual assault. With such contrary authority clearly establishing that Fanelli's testimony is relevant and helpful in explaining

the context of the aggrieved persons' post-incident behavior, Bell's sources are not persuasive. *See United States v. Smith*, 1998 WL 136564, at *2; *Johnson*, 860 F.3d at 1140; *Snider*, 973 F.2d at 558–60.

Fanelli's testimony regarding the aggrieved persons is relevant to help the jury understand how individuals who experience sexual assault or harassment can respond to that conduct. This is an area not within the typical knowledge or "kin" of a layperson. This understanding will help the jury properly evaluate each aggrieved person's testimony and credibility. This is particularly relevant in cases like this that rely so heavily on witness testimony. And to the extent an aggrieved person's post-incident behavior might intuitively cut against their credibility—such as failing to report the incident or remaining in contact with the alleged perpetrator—Fanelli's expert testimony seems particularly relevant and helpful to the jury. The usefulness and relevance of Fanelli's explanation of aggrieved persons' post-incident behavior is underscored by the fact that Bell has questioned every single aggrieved person in this case and has highlighted the fact that they did not report the sexual harassment to law enforcement or some other governmental agency. *See* [R. 103-1, p. 8 (excerpt of S.P.'s deposition)]; [R. 103-2, p. 3 (excerpt of M.C.'s deposition)]; [R. 103-3, p. 2 (excerpt of M.G.'s deposition)]; [R. 103-4, p. 2 (excerpt of A.D.'s deposition)]; [R. 103-5, p. 2 (excerpt of B.S.'s deposition)]; [R. 103-6, pp. 3–4 (excerpt of B.T.'s deposition)]; [R. 103-7, p. 3 (excerpt of L.M.'s deposition)]; [R. 103-8, p. 2 (excerpt of J.B.'s deposition)]; [R. 103-9, pp. 4–5 (excerpt of L.B.'s deposition)].

The Court believes that without Fanelli's expert testimony to provide helpful context "the average juror is unlikely to understand" the aggrieved persons' post-incident conduct to properly evaluate their credibility. *See Rios*, 830 F.3d at 413. Accordingly, the Court disagrees with Bell's claim that Fanelli's testimony is not relevant to this case and finds that this second requirement is

met. *See In re Scrap Metal*, 527 F.3d at 528–29; *United States v. Smith*, 1998 WL 136564, at \*2 (upholding the admissibility of expert testimony that victims of rape or sexual assault often delay or do not report their rapes or assaults); *LaVictor*, 848 F.3d at 443 ("Although this Circuit's pronouncements on the issue have been more muted, we did recognize in an unpublished decision that an expert witness's testimony on why victims do not report incidents of domestic abuse was relevant." (citing *United States v. Smith*, 1998 WL 136564)); *Sanford*, 387 F. Supp. 3d at 788 (noting that the *LaVictor* found such expert testimony to "be helpful to the jury, particularly to rebut common misconceptions about rape victims, such as by explaining that an inability to recall specific details is typical for victims of physical trauma, and to rebut a defendant's assertion that a victim was unreliable because the rape was not immediately reported").

### c.      Reliability

Rule 702 also guides the trial court by providing general standards to assess reliability: whether "the testimony is based on sufficient facts or data," "whether the testimony is the product of reliable principles and methods," and whether "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702. In addition, the Supreme Court has provided a non-exclusive checklist for trial courts to consult in evaluating the reliability of expert testimony, including: "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific community." *United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001) (internal quotation marks omitted) (citing *Daubert*, 509 U.S. at 593–94). However, "[t]he test of reliability is 'flexible,' and the *Daubert* factors do not constitute a 'definitive checklist or test,' but may be tailored to the facts of a particular case." *In re Scrap Metal*, 527 F.3d at 529 (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999)). Thus, the Sixth Circuit has

32

"recognized that the *Daubert* factors are not dispositive in every case and should be applied only where they are reasonable measures of the reliability of expert testimony." *Id.* (internal quotation marks and citation omitted).

Bell states in the motion's introduction that Fanelli's "testimony is not the product of reliable principles and methods, and his proffered opinions do not reflect a reliable application of the principles and methods to the facts of the case," [R. 79, p. 1], and later cites law pertaining the reliability requirement, *id.* at 6 (citing *Walker v. S. Health Partners*, 576 F. Supp. 3d 516, 531–32 (E.D. Ky. 2021)). However, Bell makes no specific argument as to why Fanelli's proffered testimony is unreliable. *See generally id.* The Court agrees with the United States, [R. 103, p. 13], that Bell has not meaningfully challenged the reliability of Fanelli's proffered opinion testimony.

Nonetheless, the Court finds that the United States has met its burden in establishing that Fanelli's testimony is sufficiently reliable. *See* [R. 103, pp. 12–13]. As the Supreme Court has noted, "the relevant reliability concerns may focus upon personal knowledge or experience" of the expert. *Kumho Tire Co.*, 526 U.S. at 150. Fanelli's opinions are based upon his many years as both a law enforcement officer and a consultant for the IACP. [R. 80, pp. 3–4]; *see also id.* at 15–17 (Fanelli's CV). During those years, Fanelli created curricula and trained law enforcement officers on trauma-informed investigations, sexual assault, gender-based violence, and alcohol- and drug-facilitated sexual assault. *Id.* Courts have noted that content from the IACP is "broadly recognized as [an] authoritative national standard[] in the field of police practices." *Blackmon v. City of Chicago*, No. 19 C 767, 2022 WL 3909182, at *4 (N.D. Ill. Aug. 30, 2022) (collecting cases); *see also Thomas v. Lambert*, 606 F. Supp. 3d 592, 602 (E.D. Mich. 2022) (noting the same). Accordingly, the Court finds that this third and final requirement is met. *See In re Scrap Metal*, 527 F.3d at 528–29; *LaVictor*, 848 F.3d at 443 (affirming a finding of an expert's reliability despite

defendant's challenge of the expert's "reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes, and lack of scientific testing"); *id.* (citing to Seventh Circuit precedent of an expert "citing anecdotal rape research to explain victim's 'failure to immediately notify the police that she had been raped' and her 'inability to recall the details of the crime clearly' could 'be consistent with that of a person who was raped.'" (quoting *Beauchamp v. City of Noblesville*, 320 F.3d 733, 745 (7th Cir. 2003)); *id.* (citing to *United States v. Smith*, 1998 WL 136564 for the same proposition). With all three requirements satisfied, the Court rejects Bell's claim that Fanelli's expert testimony must be excluded under Rule 702.

### d.    Prejudice

Bell states at the end of his motion that Fanelli's expert testimony, if allowed, would cause "extreme prejudice" to Bell. [R. 79, pp. 11–12]. He argues that "[i]f Mr. Fanelli were permitted to opine ad nauseum about sexual assault victims and their customary responses and reactions, a jury could easily ignore Mr. Bell's own testimony denying any harassment." *Id.* at 12. Although Bell does not once cite to any legal authority in making this argument, the Court construes this argument as a separate challenge to Fanelli's testimony under Federal Rule of Evidence 403. For many of the same reasons stated above, the Court rejects this challenge. First, as courts have similarly held, Fanelli's testimony is very helpful in explaining the context of the aggrieved persons' post-incident behavior. *See United States v. Smith*, 1998 WL 136564, at *2; *Johnson*, 860 F.3d at 1140; *Snider*, 973 F.2d at 558–60. Thus, the probative value of such testimony is substantial. Given that the scope of Fanelli's proffered testimony is focused on providing context to the aggrieved persons' post-incident behavior, the Court does not agree that this testimony would be extremely prejudicial as Bell claims. [R. 79, pp. 11–12]. Further, insofar as Bell argues that Fanelli's testimony risks confusing the jury, the Court is likewise unpersuaded. Given the alleged facts of this case, the

34

Court does not share in Bell's concern that the jury would become confused as to why Fanelli is testifying about victims' responses to sexual assault and battery. For many of the same reasons that Fanelli's testimony is both relevant and helpful to this case, it does not pose the risk of confusing the jury as Bell so claims. Simply put, the probative value of Fanelli's proffered testimony is not substantially outweighed by the risk of unfair prejudice to Bell or risk of confusing the jury. Fed. R. Evid. 403.

Accordingly, and for the many reasons detailed above, the Court will deny Bell's Motion in Limine to Exclude Plaintiff's Expert Witness.

### C.    The United States' Motion for Rule 37(e) Remedies, [R. 82]

The United States filed a Motion for Rule 37(e) Remedies for Defendant's Spoliation arguing that it is entitled to an adverse inference jury instruction due to Bell's alleged intentional deletion of relevant text messages. [R. 82]. Bell responded, [R. 99], and the United States replied, [R. 106]. For the reasons stated below, the Court will grant the United States's motion and likewise grant its request for a mandatory adverse-inference jury instruction based on the lost text messages.

### 1.    Legal Standard

Before the 2015 amendment to Rule 37, the Sixth Circuit's sole standard for spoliation sanctions required a party to show that (1) the individual who controlled the evidence had an obligation to preserve it at the time it was destroyed, (2) the destruction was done with a culpable state of mind, and (3) the evidence destroyed was such that a reasonable trier of fact could find that it would support the adversely affected party's claim or defense. *See Beaven v. U.S. Dep't of Just.*, 622 F.3d 540, 553 (6th Cir. 2010); *Schnatter v. 247 Grp., LLC*, No. 320CV00003BJBCHL, 2022 WL 2402658, at *7 (W.D. Ky. Mar. 14, 2022). With Rule 37(e) essentially incorporating this standard, courts are now guided by the elements set forth in Rule 37(e) for spoliation of

35

electronically stored information ("ESI"). *See Cox v. Ruckel*, No. 23-5698, 2025 WL 2603787, at *10 (6th Cir. Sept. 9, 2025); *see also Safelite Grp., Inc. v. Lockridge* ("*Safelite Grp. II*"), No. 2:21-CV-4558, 2024 WL 4343038, at *4 (S.D. Ohio Sept. 30, 2024) (applying only the elements found in Rule 37(e)); *Prudential Def. Sols., Inc. v. Graham*, No. 20-11785, 2021 WL 4810498, at *4 (E.D. Mich. Oct. 15, 2021) (same); *Courser v. Mich. House of Representatives*, 831 F. App'x 161, 187–88 (6th Cir. 2020) (explaining that "succeed[ing] on a Rule 37 motion based on spoliation" now requires satisfying all of Rule 37(e)'s requirements); *Kean v. Brinker Int'l, Inc.*, No. 3:22-CV-00885, 2024 WL 1815346, at *8 (M.D. Tenn. Apr. 25, 2024) (applying the old standard "for non-electronic evidence, to which Rule 37(e) does not apply"), *aff'd in part, vacated in part, rev'd in part*, 140 F.4th 759 (6th Cir. 2025).

Rule 37(e) states that

> (e) Failure to Preserve Electronically Stored Information. If electronically stored information that should have been preserved in the anticipation or conduct of litigation is lost because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery, the court:
>> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
>> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>>> (A) presume that the lost information was unfavorable to the party;
>>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e). Accordingly, a party seeking a spoliation sanction under Rule 37(e) for lost ESI must show that "(1) ESI that 'should have been preserved in the anticipation or conduct of litigation; was lost; (2) [t]he party responsible for preserving the information 'failed to take reasonable steps to preserve' it; and (3) [t]he information 'cannot be restored or replaced through additional discovery.'" *Safelite Grp. II*, 2024 WL 4343038, at *4 (quoting Rule 37(e)).

36

As the Sixth Circuit has noted, the difference in potential sanctions between Rule 37(e)(1) and (e)(2) is the distinction "between negligent and intentional spoliation." *Cox*, 2025 WL 2603787, at *10. Accordingly, to be granted relief under Rule 37(e)(2), the moving party must prove the additional element that the opposing party "acted with the intent to deprive another party of the information's use in the litigation." A court must find this requisite intent and a "showing of negligence or even gross negligence will not do the trick." *Applebaum v. Target Corp.*, 831 F.3d 740, 745 (6th Cir. 2016). Under Rule 37(e)(2), a court may issue various forms of sanctions, including—as relevant here—to "instruct the jury that it may or must presume the information was unfavorable to the party." Fed. R. Civ. P. 37(e)(2)(B). Whereas, under Rule 37(e)(1), if a party can instead demonstrate prejudice by the loss of the information, then the court "may order measures no greater than necessary to cure the prejudice." Nonetheless, courts have "broad discretion to craft proper sanctions for spoliated evidence." *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009).

### 2.   Discussion

In its motion, the United States alleges that "Mr. Bell deleted text messages between himself and his ex-wife, Edna Bell, an individual whom both parties acknowledged was a person with discoverable information." [R. 82, p. 1]. The United States argues that "[b]ecause Bell, while on notice of his duties to preserve such information during the pendency of this litigation, intentionally deleted text messages that cannot be recovered through additional discovery, his conduct qualifies as spoliation of evidence." *Id.* The United States further claims that

> [g]iven the timing of the deletion, the unfavorable content of the partial messages that Mr. Bell produced, and the lack of credible explanation for Mr. Bell's selective deletion of the text messages, the Court can reasonably infer Mr. Bell's admittedly intentional destruction of the evidence was performed with the intent to deprive the United States of the text messages' use in this litigation.

37

*Id.* The United States asks the Court to grant a *mandatory* adverse inference jury instruction pursuant to Rule 37(e)(2) that it *must* presume "that Defendant intentionally destroyed his text messages with Ms. Bell after he had a duty to preserve them and that, accordingly, the jury should presume this evidence would have been helpful to the United States in proving its case." *Id.* at 1–2; *id.* at 2 n.1. As alternative relief and pursuant to Rule 37(e)(1), the United States requests permissive adverse inference instruction "that Defendant destroyed his text messages with Ms. Bell after he had a duty to preserve them and that the jury *may*, *but is not required to*, infer the deleted text messages would have been helpful to the United States' case." *Id.* at 2; *id.* at 2 n.2 (emphasis added).

As a preliminary matter, the Court will address the parties' arguments as to the proper standard of proof under Rule 37(e). *See* [R. 99, p. 5]; [R. 106, p. 6–7]. As multiple courts have noted, this remains an open issue in the Sixth Circuit. *See Franklin v. Shelby Cnty. Bd. of Educ.*, No. 20-CV-02812-JPM-TMP, 2021 WL 6066673, at *3 n.1 (W.D. Tenn. Sept. 28, 2021), *report and recommendation adopted in part*, No. 220CV02812JPMTMP, 2021 WL 5449005 (W.D. Tenn. Nov. 22, 2021); *Yoe v. Crescent Sock Co.*, No. 1:15-CV-3-SKL, 2017 WL 5479932, at *9 n.7 (E.D. Tenn. Nov. 14, 2017). Largely following caselaw established by district courts in the Second Circuit, district courts within the Sixth Circuit typically require the moving party to prove the elements of Rule 37(e) by clear and convincing evidence. *See, e.g.*, *Franklin*, 2021 WL 6066673, at *3; *Safelite Grp. II*, 2024 WL 4343038, at *7. However, last year, the Second Circuit overruled that caselaw and held that the proper standard is only a preponderance of the evidence. *Hoffer v. Tellone*, 128 F.4th 433, 435 (2d Cir. 2025) ("We hold that to impose sanctions pursuant to Rule 37(e)(2), a district court or a jury must find, by a preponderance of the evidence, that a party acted with an 'intent to deprive' another party of the lost information."). The only other

circuit court to consider the issue likewise found that the preponderance of the evidence standard was the proper standard under Rule 37(e). *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 778–81 (7th Cir. 2016). The Court is persuaded by the reasoning set forth in those cases and believes that the preponderance of the evidence standard is likely the proper standard under Rule 37(e). However, the Court need not decide that issue because—as discussed in detail below for each element—the Court finds that the United States has met its burden under either standard.

a.      **Bell's Duty to Preserve and Reasonable Steps Taken**

Under the first two elements of Rule 37(e), the United States must establish that (1) there were text messages deleted while Bell had a known duty to preserve them, and (2) Bell failed to take reasonable steps to preserve them. *See* Rule 37(e). Bell makes no attempt to challenge these two elements in his response, *see generally* [R. 99], and the Court finds that these two elements are clearly met.

"An obligation to preserve evidence exists when the party should have known that the evidence may be relevant to future litigation." *Yoe*, 2017 WL 5479932, at *9 (citing *Beaven*, 622 F.3d at 553); *see also Schnatter*, 2022 WL 2402658, at *7 ("The 2015 amendment to Rule 37(e), leaves the duty analysis under *Beaven* intact."). On March 1, 2023, the United States hand-delivered a letter to Bell notifying him of its intention to file suit against him. [R. 82-4, p. 1]. The letter explicitly notified Bell of his duty to

> maintain in their current form any and all records, documents, files, or tapes, including emails, *text messages*, and computer files, in your custody or control, or in the custody or control of any of your partners, agents, or employees, that refer or relate in any way to the residential rental properties that you own or manage, or residential rental properties that they have owned or managed. *You must not alter, destroy, or otherwise dispose* of any such records after receipt of this letter.

*Id.* at 4 (emphasis added).

39

As the United States represents, both parties identified Ms. Bell as a person likely to have discoverable information at the beginning of discovery in July 2023. [R. 82, p. 9]; *see also* [R. 15 (Bell's notice to take deposition of Ms. Bell)]. Bell's awareness of the relevance of his texts with Ms. Bell is underscored by his statements early on in the case that he believed Ms. Bell was "behind all of this" and that she was "the ringleader" driving the lawsuit. [R. 82-4, p. 2]. Outside of this, the fragmented portions of the texts that were turned over demonstrate that at least some of the deleted portions were clearly relevant to this case and related to the management of his rental properties. *See, e.g.*, [R. 82-9, p. 38 ("[Yo]u can't talk to women in a sexual and perverted way. I'm showing up for all of them . . . I knew they would finally get [yo]u.")]; *id.* at 23 (Ms. Bell threatens to talk to Bell's former tenant and named aggrieved person, M.G.); [R. 82-10, pp. 122–123 ("I guess she thinks she can trade pussy for rent since everyone else does.")]. Despite this, sometime between May 2023 and October 2024, Bell deleted several months of text messages between himself and Ms. Bell while also making substantial payments to Ms. Bell. [R. 82-8, pp. 1–2].

When a party takes intentional and deliberate action to delete ESI, the element of failing to take reasonable steps to preserve it is clearly satisfied. *See Crown Battery Mfg. Co. v. Club Car, Inc.*, 185 F. Supp. 3d 987, 999 (N.D. Ohio 2016) ("Once the duty to preserve attaches, a party must suspend its routine document retention/destruction policy and put in place a litigation hold to ensure the preservation of relevant documents." (citation omitted)); *Schnatter,* 2022 WL 2402658, at *10 (finding a failure to take reasonable steps to preserve ESI where the party "deliberately deleted" text messages); *Prudential,* 2021 WL 4810498, at *7 (finding an individual failed to take reasonable steps to preserve ESI when he deleted information off of his phone). Here, Bell admits that he deleted some of the text messages between himself and Ms. Bell. [R. 100, ¶ 9]. While Bell

40

contends that none of the deleted texts bore any relevance to this case, *id.* at ¶¶ 4, 11, as mentioned above, Ms. Bell's clear importance to this case and the fragmented texts that were produced suggest otherwise.

Accordingly, with the first two elements not meaningfully disputed by Bell, and the evidence clearly establishing that Bell was under a duty to preserve the text messages when he intentionally deleted them, the Court finds that these first two elements are met.

### b. Potential Replacement with Additional Discovery

The third element under Rule 37(e) requires that the lost information cannot be restored or replaced through additional discovery. In its motion, the United States establishes that it has attempted to obtain the texts from Ms. Bell's phone instead, but that these attempts have been unsuccessful. [R. 82, p. 10]. In his response, Bell makes two arguments suggesting that the information of the illegal texts could be replaced through additional discovery. First, he argues that the information from the lost text messages could be replaced through Ms. Bell's testimony stating that "Ms. Bell has been available from the outset of this case for a deposition, yet the United States has chosen not to depose her." [R. 99, p. 7]. Second, Bell argues that the United States could obtain the lost text messages through the phone records of Bell's phone carrier AT&T, but that "the United States has never issued a subpoena" to them. *Id.* The United States addresses each of these arguments in its reply. [R. 106, p. 3]. The Court agrees with the United States that these deleted text messages cannot be feasibly recovered or replaced.

First, Ms. Bell's testimony would not be an adequate replacement of the deleted texts because "there is no substitute for the messages themselves." *Safelite Grp. II*, 2024 WL 4343038, at *4. The Court in *Safelite Grp. II* explained that

> [t]he content of text messages cannot be replaced simply by eliciting testimony
> from the Defendants, and by having Plaintiff accept that testimony rather than

41

relying on the actual messages to use as they deem fit. Without the lost text messages, Plaintiff is deprived of the opportunity to know 'the precise nature and frequency' of those private communications, which occurred during a critical time period.

*Id.* (quoting *Schmalz v. Vill. of N. Riverside*, No. 13 C 8012, 2018 WL 1704109, at \*4 (N.D. Ill. Mar. 23, 2018)); *see also Skanska USA Civ. Se. Inc. v. Bagelheads, Inc.*, 75 F.4th 1290, 1313 (11th Cir. 2023) (rejecting the argument that a witness's testimony long after the event could serve as an adequate replacement for lost text messages). This is especially true here where Ms. Bell's credibility is tainted through Bell's payments that occurred during this time when she was making accusations and threats to support the other aggrieved persons if Bell did not pay her. [R. 99, p. 3]; *see also* [R. 82-5 (Bell's payment records showing he paid Ms. Bell approximately $32,000)]; [R. 101, ¶¶ 7–10 (Ms. Bell's affidavit)]. Bell claims that he paid her because she needed help. [R. 100, ¶¶ 7–8]. However, Bell's testimony from his deposition suggests that at least some of these payments were made in response to Ms. Bell's accusations and threats. *See* [R. 82-7, p. 1 (Bell answering "yes" to the question on if he made payments to Ms. Bell "[b]ecause when you tell her no, she gets ugly and threatening, right?")]. This comports with Ms. Bell's text messages showing her veiled threats to Bell if he did not pay her. [R. 82-9, pp. 17–18 ("Put 15 dollars on my app[.] I swear I'm going to end up doing something bad[.]")]; [R. 82-10, pp. 13–14 ("[M]y mouth likes to run when I'm tired and hurting and hungry [yo]u never known when I might slip up and say something[.]")]; *see* [R. 82-7, p. 1 (Bell admitting that Ms. Bell threatened to give the United States damaging information about him if he did not give her money)]. Simply put, Ms. Bell's credibility has been severely compromised, and her testimony would thus not be an adequate replacement for the deleted texts under Rule 37(e).

Second, the United States is not able to obtain the deleted text messages through a subpoena to Bell's cellphone service provider, AT&T. The issue for Bell is that AT&T only retains the

42

content of text messages for ninety days. *See, e.g.*, Joseph Cox, *Here's the FBI's Internal Guide for Getting Data From AT&T, T-Mobile, and Verizon*, VICE (Oct. 25, 2021), https://www.vice.com/en/article/how-fbi-gets-phone-data-att-tmobile-verizon/ [https://perma.cc/QR65-DRGG]; Suzanne Choney, *How long do wireless carriers keep your data?*, NBC NEWS (Sept. 29, 2011), https://www.nbcnews.com/technolog/how-long-do-wireless-carriers-keep-your-data-120367 [https://perma.cc/6FHV-HS8H]; *see also Federico v. Lincoln Mil. Hous., LLC*, No. 2:12-CV-80, 2014 WL 7447937, at \*8 (E.D. Va. Dec. 31, 2014) (relying on publicly available information to take judicial notice that "[a]mong major carriers Verizon, T-Mobile, Sprint, and AT&T, only Verizon retains text message content"). Since that period of time is long past, any subpoena issued to AT&T to recover the contents of these deleted text messages would almost certainly be futile.

The United States is not required to pursue every possible avenue and turn over every possible stone in searching for a replacement of the lost text messages. All that is required for Rule 37(e) is that the United States "made some good-faith attempt to explore alternatives before pursuing spoliation sanctions." *Enoch v. Hamilton Cnty. Sheriff's Off.*, No. 1:16-CV-661, 2019 WL 1755966, at \*11 (S.D. Ohio Apr. 19, 2019), *rev'd in part on other grounds*, 818 F. App'x 398 (6th Cir. 2020) (quoting *Steves & Sons, Inc. v. JELD-WEN, Inc.*, 327 F.R.D. 96, 109 (E.D. Va. 2018)). The United States has done so to no avail. Accordingly, since the information of the deleted text messages cannot be feasibly recovered or replaced, this third element is met. With these three elements met, the United States has made its threshold showing under Rule 37(e).

### c.    Intent to Deprive

As mentioned, to be granted relief under Rule 37(e)(2), the United States must show that Bell "acted with the intent to deprive another party of the information's use in the litigation." A

43

"showing of negligence or even gross negligence will not do the trick." *Applebaum*, 831 F.3d at 745. "Courts should consider the extent to which a party was on notice that litigation was likely and that the information would be relevant." *Culhane v. Wal-Mart Supercenter*, 364 F. Supp. 3d 768, 773 (E.D. Mich. 2019) (quoting Fed. R. Civ. P. 37(e), Advisory Comm. Notes (2015)). In assessing culpability for spoliation, "the veracity of [a party's] stated reasons for destroying the [evidence] is an issue of credibility" for the court to determine. *Beaven*, 622 F.3d at 554 (citation and quotation marks omitted).

Because "[i]ntent rarely is proved by direct evidence," courts have "substantial leeway to determine intent through consideration of circumstantial evidence, witness credibility, motives of the witnesses in a particular case, and other factors." *Morris v. Union Pac. R.R.*, 373 F.3d 896, 901 (8th Cir. 2004); *see also Automated Sols. Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 514 (6th Cir. 2014) ("A party seeking an adverse inference may rely on circumstantial evidence to suggest the contents of destroyed evidence." (quoting *Beaven*, 622 F.3d at 555)). The types of circumstantial evidence that courts typically consider in determining if the party had the requisite intent include the timing of the spoliation, whether there was selective destruction of the ESI, the method of the destruction, whether destruction or deletion was a routine practice for the spoliating party, the likely relevance of the lost ESI, and the consistency and credibility of the given explanation largely driven by the credibility of the spoliating party. *See Nagy v. Outback Steakhouse*, No. CV 19-18277(MAS)(DEA), 2024 WL 712156, at *5 (D.N.J. Feb. 21, 2024) ("Factors that may be consider include the timing of the destruction, whether there was selective preservation, and what preservation policies the party had in place."); *Dorn v. Dominique*, No. 3:20-CV-118-BJB, 2025 WL 2813902, at *4 (W.D. Ky. Sept. 30, 2025) (considering the timing of the deletion "two years into this multijurisdictional saga" and the fact that the party followed a

44

routine "deletion policy" for years); *Bistrian v. Levi*, 448 F. Supp. 3d 454, 476 (E.D. Pa. 2020) ("The timing of the destruction can be a factor. So can the method of deletion—automatic overwriting is generally less culpable than affirmative deletion, which in turn is less culpable than taking additional steps to erase backup copies. Selective preservation can also reflect intent."); *NuVasive, Inc. v. Day*, No. CV 19-10800-DJC, 2021 WL 9059745, at *9 (D. Mass. Aug. 23, 2021) (finding the requisite intent in part because the spoliating party's "credibility [was] highly suspect"); *PDV USA, Inc. v. Interamerican Consulting Inc.*, No. 20-CV-3699 (JGK) (RWL), 2026 WL 203036, at *17–20 (S.D.N.Y. Jan. 27, 2026) (finding the requisite intent in part because the messages were intentionally deleted, there was selective destruction of messages from the same time period, and the spoliating parties shifted their explanations multiple times); *Jones v. Riot Hosp. Grp. LLC*, No. CV-17-04612-PHX-GMS, 2022 WL 3682031, at *5–6, (D. Ariz. Aug. 25, 2022), *aff'd*, 95 F.4th 730 (9th Cir. 2024) (finding the requisite intent because the messages were intentionally deleted, there was selective destruction, the deletion occurred after notice of duty to preserve, and the fragment of one of the deleted messages showed that it had "direct bearing on her case"); *Safelite Grp., Inc. v. Lockridge* ("*Safelite Grp. I*"), No. 2:21-CV-4558, 2025 WL 2717319, at *7–8 (S.D. Ohio Sept. 24, 2025) (finding the requisite intent in part because the spoliating party's "inconsistent and implausible testimony destroyed his credibility").

The United States argues that there is sufficient evidence for the Court to find that Bell deleted the text messages with the intent to prevent its use in the litigation of this case. [R. 82, pp. 11–14]; [R. 106, pp. 7–10]. Bell provides two justifications for the lost text messages, the latter of which was asserted for the first time ever in his response. First, Bell claims that the exchange of the text messages between Bell and Ms. Bell, his ex-wife, had "caused marital tensions" between Bell and his current spouse, and thus, he deleted the texts "in an attempt to mitigate or reduce the

45

tension." [R. 99, p. 2]; [R. 100, ¶ 9]; *see also* [R. 82-8, p. 2]. This is the sole justification that Bell provided the United States until the litigation of the present motion. *See* [R. 106, p. 9]; *see also* [R. 82-8, p. 2]. In his response and Bell's attached affidavit, Bell asserts for the first time that within the past year he "switched from an Android phone to an I-phone, and in the process of that transfer, Mr. Bell believes that he may have lost some of his text messages including those between himself and [Ms. Bell]." [R. 99, p. 2]; [R. 100, ¶ 10].

Notwithstanding Bell's claims to the contrary, [R. 100, ¶¶ 4, 11], the significant circumstantial evidence supports a finding that the deletion was done with the intent to prevent the use of the text messages in this case. First, the timing of the deletion is highly suspect. As mentioned, Bell first received notice of this litigation on March 1, 2023. [R. 82-4, p. 1]. Shortly thereafter, on March 18, 2023, Bell made his first payment to Ms. Bell seemingly in response to Ms. Bell's threats to reveal harmful information to law enforcement. *See* [R. 99, p. 3]; [R. 82-5, p. 32]. Bell's last recorded payment to Ms. Bell occurred on August 29, 2024. [R. 82-5, p. 116]. Bell deleted the text messages sometime between May 2023 and October 2024. [R. 82-8, p. 1]. The Court does not believe that the timing of Bell deleting the texts and him sending Ms. Bell an approximate $32,000 in response to her threats was a mere coincidence. *See* [R. 82-5, p. 32]. This is further supported by the fact that Bell has not once claimed—let alone shown—that he had a prior habit or routine of deleting texts off of his phone. *See generally* [R. 99]; [R. 100].

Second, the Court is unconvinced by Bell's explanations for the deleted texts. *See generally* [R. 100]. Beginning with his new explanation that the texts could have been lost while changing phones, *id.* at ¶ 10, the Court is unconvinced. The fact that Bell has only now asserted this for the first time and made no mention of it to the United States before the filing of this motion is highly suspect. As the United States points out, if this justification is true, it seems to suggest that Bell

has engaged in additional spoliation based on the failure to preserve the contents of his previous phone while transferring it. [R. 106, p. 5]. However, the Court need not even consider this alternative explanation. Bell has already admitted that he intentionally deleted the text messages. [R. 100, ¶ 9]. Accordingly, what matters is his explanation for that intentional deletion.

Turning to Bell's principal explanation that he deleted the texts to resolve marital tension, the Court is likewise unconvinced. The Court struggles to see how Bell selectively deleting only *some* text messages between him and Ms. Bell would help resolve marital tension, when he claims their communication itself caused the tension. *See* [R. 99, p. 2 ("[T]he exchange of these text messages between [Bell] and [Ms. Bell] has caused marital tensions between [Bell] and his current spouse."); [R. 100, ¶ 8 ("Because I have attempted to continue to provide for and help my former spouse, this has required occasional text messaging with Ms. Bell. Naturally this has caused some tension between your Affiant and his current spouse.")]. The method of deletion was targeted and selective, rather than deleting all messages at once, or through an automated deletion process in his phone. Importantly, the fragmented portions of the non-deleted texts provided by his lawyer show that the content of at least some of the deleted texts were clearly relevant to this case. *See, e.g.*, [R. 82-9, p. 38 ("[Yo]u can't talk to women in a sexual and perverted way. I'm showing up for all of them . . . I knew they would finally get [yo]u.")]; *id.* at 23 (Ms. Bell threatens to talk to Bell's former tenant and named aggrieved person, M.G.); [R. 82-10, pp. 122–123 ("I guess she thinks she can trade pussy for rent since everyone else does.")].

Moreover, the credibility of Bell's explanations is tainted by his conduct during discovery of this case. During discovery, in ruling on the United States's motion to compel, United States Magistrate Judge Hanly A. Ingram stated:

> The assurance the receipt book would be produced followed by vague objections to doing so *strike the Court as game playing*. It seems as if the receipt book was

found and *Defendant elected not to produce it because it contains prejudicial or harmful information. . . .*

The Court notes that, when a late objection is asserted by a party in this manner, without a basis, it colors all of that party's arguments on similar issues. In other words, *Defendant's position on this issue causes the Court to doubt the merits of other positions taken in response to the motion.*

[R. 50, p. 4 (emphasis added)]. Especially given the similarity of these two issues, Judge Ingram's statements weigh heavily on this Court in finding Bell's explanations to not be credible. This is further supported by Bell's shifting explanations, asserting for the first time in his response an entirely new explanation for the deleted text messages.

Bell further argues that "Bell is seventy-one (71) years of age and is technologically illiterate," and thus, "Bell has never willfully or knowingly spoliated any evidence or destroyed any evidence including any electronically stored information relevant to this case." [R. 99, p. 4]; [R. 100, ¶¶ 4, 11]. The Court is unpersuaded. It is difficult to believe on the one hand that Bell was sufficiently technologically *literate* to be able to delete text messages between himself and Ms. Bell, ostensibly to resolve marital tensions with his current wife, while on the other hand he was too technologically *illiterate* to delete those same texts with the intention of hiding them from the United States. It is undisputed that Bell intentionally deleted the text messages. The record demonstrates that Bell had sufficient technological literacy to delete the text messages with the requisite intent under Rule 37(e)(2).

Attached to Bell's response are affidavits from Bell and Ms. Bell contesting that Bell intentionally deleted relevant evidence, [R. 100, ¶¶ 4, 11], and contesting that Bell paid Ms. Bell to "buy her silence," [R. 101, ¶¶ 12, 19]. Ms. Bell further claims that she had no factual basis for accusing Bell of sexual impropriety and instead lodged those baseless accusations to cause Bell to continue to provide for her financially. *Id.* at ¶¶ 9–10. As explained in detail above, the substantial

48

circumstantial evidence demonstrates that Bell deleted the text messages with Ms. Bell with an intent to deprive the United States of valuable, relevant evidence. Further, as to Ms. Bell's claims that she essentially made it all up, the Court has serious concerns with this explanation given the text messages that were ultimately produced, the approximate $32,000 in payments to Ms. Bell, and other record evidence. *See, e.g.*, [R. 82-5 (Bell's payment records showing he paid Ms. Bell approximately $32,000)]; [R. 82-9, pp. 17–18 ("Put 15 dollars on my app[.] I swear I'm going to end up doing something bad[.]")]; [R. 82-10, pp. 13–14 ("[M]y mouth likes to run when I'm tired and hurting and hungry [yo]u never known when I might slip up and say something[.]")]; *id.* at 1–27 (suggesting that Bell and Ms. Bell met in person two days after the United States requested Bell's text message information and after which Ms. Bell began to apologize for all the "nasty messages" and "lies" she had sent).

Taken together, given the timing of the deletion after he was under a clear duty to preserve the text messages; the affirmative and selective method of deletion; the clear relevance of at least some of the lost messages; Bell's payments to his ex-wife Ms. Bell totaling approximately $32,000 and which began shortly after he received notice of this litigation; the implausibility and shifting nature of the explanations provided; and Bell's tarnished credibility before this Court based upon his conduct during discovery; "the most reasonable inference" is that Bell's deletion of the text messages was "sparked by an intent to conceal unfavorable information." *Prudential*, 2021 WL 4810498, at *7.

Accordingly, the Court finds that, under either a preponderance of the evidence or clear and convincing evidence, Bell deleted these text messages with the intent of depriving the United States its use in litigating this case. The United States has carried its burden under Rule 37(e)(2).

### d.    Appropriate Sanctions

Courts have "broad discretion to craft proper sanctions for spoliated evidence." *Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009). Courts can issue a variety of sanctions, "[b]ut the severity of the sanction imposed varies based on the culpability of the party responsible for destruction." *Cox*, 2025 WL 2603787, at *10 (citation and quotation marks omitted). The level of culpability can range from "innocence through the degrees of negligence to intentionality." *Beaven*, 622 F.3d at 554. "While the district court has latitude in determining what form a spoliation sanction should take, [Rule] 37(e) provides some guidance for unrecoverable electronic information." *Id.* at *10. Under Rule 37(e)(2)(B), the court may "instruct the jury that it *may or must* presume the information was unfavorable to the party." (emphasis added).

The United States asks the Court to grant a mandatory adverse inference jury instruction pursuant to Rule 37(e)(2) instructing that Bell "intentionally destroyed his text messages with Ms. Bell after he had a duty to preserve them and that, accordingly, the jury should presume this evidence would have been helpful to the United States in proving its case." [R. 82, pp. 1–2]; *id.* at 2 n.1. A mandatory inference instruction such as this is one of the enumerated options for sanctions that a court may issue under Rule 37(e)(2). Courts, however, can fashion the content of the instruction if so required. *See, e.g.*, *Cap. Senior Living, Inc. v. Barnhiser*, 713 F. Supp. 3d 407, 418–19 (N.D. Ohio 2024) (issuing a mandatory inference instruction under Rule 37(e)(2) but altering its content so that the jury should infer that only "some" of the deleted texts would show the claim at issue and not that "each" of the deleted texts were "irrefutable evidence" as the moving party request). The United States in its request does not go as far as to request that the jury should presume that *every* deleted message would support its case against Bell. *See* [R. 82, p. 1]. Instead, the United States request that the jury should presume the deleted texts generally would have been

helpful to the United States. *See id.* This request is both appropriate and proportional to the circumstances of Bell's deletion and his level of culpability, especially seen in the selective destruction of only some texts as previously discussed.

Accordingly, the Court will grant the United States's spoliation motion and likewise order that the jury be instructed that "Danny Bell intentionally destroyed relevant text messages between him and Ms. Bell after he had a known duty to preserve them for this case. Accordingly, the jury should presume that this evidence would have been helpful to the United States in proving its case." In granting the United States's principal request for relief the Court need not address the United States's alternative request under Rule 37(e)(1) and will deny it as moot.

### III.    CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** as follows:

1.  Defendant's Motion for Summary Judgment, [**R. 85**], is **DENIED**.

2.  Defendant's Motion in Limine to Exclude Plaintiff's Expert Witness, [**R. 79**], is **DENIED**.

3.  The United States' Motion for Rule 37(e) Remedies for Defendant's Spoliation, [**R. 82**], is **GRANTED** as detailed above.

4.  On or before **Friday April 24, 2026**, the parties **SHALL** meet and confer regarding the remaining claims and file a Joint Status Report advising as to whether any party requests that the matter be referred to a magistrate judge for a settlement conference, or whether the parties agree to engage in private mediation. If the parties do not request that the matter be referred for a settlement conference or advise that they are engaging in private mediation, they **SHALL** provide three potential trial dates **between October 1, 2026, and February 1, 2027**, and an estimated length of trial.

51

This the 31st day of March, 2026.

*Claria Horn Boom*

CLARIA HORN BOOM,
UNITED STATES DISTRICT COURT JUDGE
EASTERN AND WESTERN DISTRICTS OF
KENTUCKY